## Bufford v. PennDOT

254 

*Arthur T. Bufford,* in propria persona.
*Gerhard Schwaibold, deputy attorney general,* for PennDOT.

DOWLING, *J.,* September 4, 1991—

### *"Out, Damned Spot!"*

When reviewing the works of Shakespeare, there are moments that seem chillingly contemporary. In the first lines of Act IV, Scene i of *Julius Caesar,* Antony, Lepidus and Octavius are seated around a table with a list of the eminent citizens of Rome between them—deciding, in the wake of their assassination-cum-coup d'etat, who can be safely allowed to live, and who cannot:

"Antony: These many then shall die, their names are prick'd.

"Octavius: Your brother too must die; consent you, Lepidus?

"Lepidus: I do consent—

"Octavius: Prick him down, Antony.

"Lepidus: Upon condition Publius shall not live; who is your sister's son, Mark Antony.

"Antony: He shall not live; look, with a spot I damn him."[1]

---

1. The question of what leaders do to their fallen opponents in the wake of an illegal *putsch* is one with which every person on earth is vitally concerned, in light of the events in Moscow on August 19, 1991.

To most observers, there are several elements of this blood-freezing tableau that seem to issue as much from the century of Vishinsky and Ceausescu as from that of Philip II and St. Bartholomew's Day—the ease with which the powerful dispose of the fates of the powerless; the insistence by one of the self-elected demigods that, if he is to know the pain of bereavement, he will insure that his co-conspirator does as well; or the point that is central to the matter currently before us—the fact that, in a powerful state, the question of whether one's name is "pricked" on a piece of official paper can be all-important in determining one's destiny. The key difference between Shakespeare's stone-hearted triumvirate on the one hand, and the governmental agency that occupies their place in the case at bar on the other, is that Antony and Lepidus *intended* to produce the deadly results they sought; whereas, in the present instance, an innocent man endured trouble and tribulation as a result of his name being "pricked down" by pure error.

On February 3, 1990, the plaintiff, in the company of a prospective business client,[2] was driving in Washington, D.C., when he was pulled over for speeding by the U.S. Park Police. The plaintiff was, at that time, as he is at present, a resident of both Los Angeles, California and Harrisburg, Pennsylvania, and was driving under color of his Pennsylvania license. Upon 'calling the PennDOT authorities in Harrisburg to check on the status of Mr. Bufford's license, the police were informed that his license had been suspended some time previously. The plaintiff was immediately arrested, handcuffed,

---

2. The gentleman in question, Yomi Tokosi, was a businessman from Nigeria. We hope that the events currently under discussion do not represent Mr. Tokosi's only opportunity to observe the workings of the American system of justice.

taken for a 20-minute ride to the police station, issued a $50 ticket for driving under a suspended license, fingerprinted, photographed and incarcerated with another prisoner who was himself handcuffed and in leg irons. Mr. Bufford was released two hours later, after paying the fine, and had to walk six miles to his place of residence in Washington.

What made this entire transaction worthy of our review is that Mr. Bufford's license *had not been legitimately suspended* at the time of his arrest. After being informed in October 1989, that he had not yet paid a traffic citation issued against him the previous July in Delaware, Bufford paid the fine by a check in the amount of $37.25, payable to the Bridgeville, Delaware Police Department. He had sent the canceled check with which this fine was paid, together with a cover letter, to the Pennsylvania Department of Transportation, in the self-addressed envelope provided to him by PennDOT for that purpose. A receipt from the Bridgeville Police Department certifying payment of the fine on October 23, 1989 was received by the plaintiff two days after the incident in Washington.

After the events set forth above, the plaintiff attempted by letter and telephone inquiry to get the PennDOT records adjusted in his favor; and although the license suspension appears to have eventually been lifted (14 months later, in April 1991), there has been no explanation forthcoming from the agency as to how or why this comedy of errors transpired in the first place. In the interim, the plaintiff's auto insurance was canceled, after PennDOT reported the "unpaid" citation to the plaintiff's carrier; and the plaintiff has purportedly been unable to secure new insurance due to the ongoing problem with his driving records. Perhaps not unre-

latedly, his Nigerian business contact declined to enter into an agreement with the plaintiff which had been under discussion at the time of the unfortunate events of February 1990, a fact that the plaintiff not surprisingly attributes to the humiliating spectacle witnessed by his companion, and in which he was made to play the central role.

The plaintiff commenced suit in this court against PennDOT in December 1990. PennDOT filed preliminary objections to the suit, declaring that it is protected from suit by sovereign immunity, and also disputing that the plaintiff can sue for damages for his arrest and false imprisonment, under the terms of 42 Pa.C.S. §8528. The plaintiff responded to this affirmative defense by alleging two reasons why the defendant's preliminary objections should be disallowed: (1) that the affirmative defense of sovereign immunity is one that must be pled as new matter, rather than as preliminary objections, under Pa. R.C.P. 1030; and (2) that the existing suit is in any case allowed under one of the enumerated exceptions to sovereign immunity—specifically, under 42 Pa.C.S. §8522(b)(3).

For the reasons set forth below, we concur in the plaintiff's reasoning, and disallow the affirmative defense of sovereign immunity in the instant action.

It would be possible to resolve this issue neatly and completely by concentrating solely on the first of these two points; for both the case and statutory law governing the pleading of affirmative defenses is unambiguously clear. Rule 1030 states:

"Rule 1030. *New Matter*

"All affirmative defenses including but not limited to the defenses of accord and satisfaction, arbitration and award, assumption of the risk, consent, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fair com-

ment, fraud, illegality, *immunity from suit,* impossibility of performance, justification, laches, license, payment, privilege, release, res judicata, statute of frauds, statute of limitations, truth and waiver *shall be pleaded in a responsible pleading under the heading 'New Matter.'* A party may set forth as new matter any other material facts which are not merely denials of the averments of the preceding pleading." (emphasis added)

The construction of this rule has been a comparatively rare instance of legal reasoning that is short, straight and to the point. The case of *Iorfida v. Mary Robert Realty Co. Inc.,* 372 Pa. Super. 170, 539 A.2d 383 (1988), *appeal denied,* 520 Pa. 576, 549 A.2d 136, stated: "Affirmative defenses not raised in new matter in accordance with rules are waived." In that same year, the decision in *Malia v. Munchak,* 116 Pa. Commw. 484, 543 A.2d 184 (1988), said unequivocally: "Affirmative defense of immunity from suit is *required* to be raised as new matter," (emphasis added) as did the court in *Hawkins v. City of Harrisburg,* 120 Pa. Commw. 369, 548 A.2d 399 (1988), by saying: "Raising affirmative defense of immunity by preliminary objection is improper procedure; immunity is affirmative defense which should be raised as new matter."[3]

---

3. We are aware of the holding in *Allegheny County v. Dominijanni,* 109 Pa. Commw. 484, 531 A.2d 562 (1987), which stated, "If the defense of immunity is apparent on the face of the challenged pleading, the defense of immunity will be considered on preliminary objections unless the opposing party challenges this procedure by filing preliminary objections to the preliminary objections." However, we do not find this decision applicable to the instant case, for several reasons. First, no objection at all to the alleged immunity of the public authority was raised in *Allegheny,* as against the plaintiff's timely challenge to that very point in the current matter. Second, the cases we have cited above are more recent than *Allegheny,* and thus commend themselves to us as being more

However, we still feel compelled to go on to address the more complex and weighty of the two points submitted for our consideration—not only because both sides have chosen to brief it, but because it relates to a question that is of central importance to any citizen of this Commonwealth who is required to deal, in one capacity or another, with the Department of Transportation. Since this is a group that includes the majority of our state's adult inhabitants, it is in the public interest for us to clarify as large a portion as possible of that institution's powers and limitations, both for the sake of promoting its efficiency and to eliminate confusion on the part of those it is intended to serve.

The plaintiff contends that, whatever right of sovereign immunity the defendant may possess as an agency of the Commonwealth, it is nevertheless

---

reliable authorities, as does *Paz v. Commonwealth, Dept. of Corrections,* 135 Pa. Commw. 62, 580 A.2d 452 (1990), which asserted (in, let it be noted, another suit against the Commonwealth), "Immunity from suit and statutes of limitations may not be raised by demurrer in preliminary objections, but are affirmative defenses which *must* be pleaded under new matter in answer." (emphasis added) Finally, we are deeply troubled by what seems to us the attempt by the *Allegheny* court to unilaterally repeal the essence of Rule 1030 (a view that, as indicated above, has not been followed by any subsequent decisions). *All* pleadings which set forth the defense of immunity in a manner improper under Rule 1030 (such as preliminary objection) would make that defense "apparent on the face of the challenged pleading," simply by the act of asserting it; and to then shift the burden to the opposite party to *respond* in a particular manner, or else lose the advantage of their position, would effectively eviscerate the rule. This is an especially unjust result when, as here, the plaintiff is proceeding *pro se.* If the defendant, with all the resources available to it, can choose not to follow the clear guidelines of Rule 1030, we will not then penalize a *pro se* plaintiff for raising a valid issue in timely fashion under a heading other then "preliminary objection."

liable to suit in the case at bar under the third of the enumerated exceptions to that defense, which are set forth in 42 Pa.C.S. §8522:

"§8522. *Exceptions to sovereign immunity*

"(a) *Liability imposed*—The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

"(b) *Acts which may impose liability*—The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by: . . .

"(3) *Care, custody or control of personal property*—The care, custody or control of personal property in the possession or control of Commonwealth parties, including Commonwealth-owned personal property and property of persons held by a Commonwealth agency, except that the sovereign immunity of the Commonwealth is retained as a bar to actions on claims arising out of Commonwealth agency activities involving the use of nuclear and other radioactive equipment, devices and materials."

The plaintiff's contention is that, because of Penn-DOT's failure to make the appropriate updates, corrections and adjustments in the applicable

records which it kept on him—the said records constituting "personal property in the possession or control of Commonwealth parties"—to reflect the fact that he had satisfied all of his obligations outstanding with regard to his driving record, the defendant is responsible to the plaintiff for all of the injuries and losses occasioned by the arrest of February 3, 1990. The department has countered with the assertion that the section 8522(b)(3) exception to sovereign immunity would only apply if the records themselves "directly cause[d] the alleged injuries or losses;" and that, since that is purportedly not the case here, the plaintiff's claim should be barred.

Since neither party disputes that the driving records under discussion qualify as the type of property referred to by the statute, the only unresolved question is whether, in the words of the defendant itself, this is one of "those cases where it is alleged that the defect in the property itself caused the injury."

We must hold that it is. In our modern society, records of any sort—census forms, title books, tax papers, or any other form of documentation—have only one imaginable reason to exist: for the sake of the factual data contained therein. The oft-heard joke when one confronts a mass of paper—"Think of all the trees that were sacrificed to make this!"—is a tacit recognition that it is not the tangible mass of paper pulp that is of significance where records are concerned, but only the information for which the paper serves as a repository. The very fact that old-fashioned paper files can be, and often are, "computerized"—that is, the paper destroyed and the data stored on software—is another acknowledgment that the text, and not the paper, is

the only item in which anyone has any interest. It is therefore absurd to speak of an inaccuracy or defect in the factual information contained in a file as not being the "occasion of injury" in a case such as the one currently under review. The only alternative interpretation of section 8522(b)(3) would be to say that files or records cannot be the occasion for an injury unless they physically fall off a cabinet and hit someone on the head, or unless a particular document gives a handler a paper cut, which results in blood poisoning—a reading of the statute that belongs more properly to the zany fantasy world of Samuel Butler's *Erewhon,* where criminals are automatically acquitted, and crime victims prosecuted for having allowed themselves to be imposed upon.

We must add that a right to hold public authorities accountable for their negligence in the management of information is a central element in the functioning of modern democracy—indeed, we are hard pressed to think of anything more essential to it, in this age of bureaucrats and faceless officialdom. All of us, no matter how conventional or law-abiding we may be, figure prominently in documents, records, lists and files held by a myriad of banks, credit agencies, retailers and government departments, many of which are entirely beyond our sphere of control. From minor annoyances such as the unending receipt of "junk mail" from companies we do not know, and do not care to know, on up to major considerations like the approval of loans or the procuring of security clearances for federal employment, the question of "who has what on us" governs virtually every aspect of our lives; and it would be remarkable indeed if the law which this court is sworn to interpret and uphold precluded any possibility of the individual citizen holding the agents of

the government that supposedly derive "their just powers from the consent of the governed"[4] liable for their errors and misdeeds in this area.[5]

The reasoning cited by the defendant in his brief has not persuaded us of the validity of the contrary view of the case at bar. A reference to *Nicholson v. N&S Detective Agency Inc.,* 94 Pa. Commw. 521, 503 A.2d 1106 (1986), strikes us as inapposite on several counts.[6] That case dealt with a suit by a woman who was assaulted by a security guard who worked at the bank where she was employed, and who was himself employed by the defendant. The plaintiff alleged that a comparison between the

---

4. *The Declaration of Independence,* July 4, 1776.

5. The great Russian writer and dissident Alexander Solzhenitsyn once commented that if, on a city street during an ordinary day, strings were attached to each man and woman, connecting them to every office and archive where there was a file or record with their name on it, the air would be so crowded and choked with strings that no one would have the physical freedom to move a muscle. It is against the backdrop of this great, and decidedly sobering, truth about life in the late 20th century that we have considered the instant case.

6. It is, however, strikingly pertinent with reference to the first issue with which we opened our discussion of this matter. Footnote 1 reads: "(1) Immunity from suit is an affirmative defense which should be pleaded under the heading of 'New Matter' in a responsive pleading rather than as a preliminary objection. Pa.R.C.P. 1030. *While we do not condone a disregard of the Pennsylvania Rules of Civil Procedure,* we will again consider this defense as here raised inasmuch as the appellee did not file a responsive pleading directed to this procedural issue, but only raised such before this court. *Kastner v. PennDOT,* 32 Pa. Commw. 267, 378 A.2d 1050 (1977); see also, *Walter v. Commonwealth,* 30 Pa. Commw. 248, 373 A.2d 771 (1977); *Freach v. Commonwealth,* 471 Pa. 558, 370 A.2d 1163 (1977)." (emphasis added)

We note that the plaintiff in the instant case did *not* wait until he was before the court to raise this issue, but *did* file a responsive pleading for our consideration beforehand.

fingerprints of the assailant, and those on file of all known criminals, at the time of his initial hiring (a clearance measure required by law), would have revealed him to be himself a criminal with an extensive known record. The state police had, apparently, reported to the defendant at the time that no one with the assailant's fingerprints had a criminal record. The plaintiff's case against the Commonwealth (based on the negligence of the state police in conducting the records search) was, quite properly, dismissed on the grounds of sovereign immunity. The *Nicholson* court, in discussing the applicability of 42 Pa.C.S. §8522(B)(3), declared: "[While] [t]he criminal records themselves are Commonwealth-owned personal property; . . . in this case the records were not involved in the chain of causation, only the negligent search of them. Additionally, the 'care' or 'custody' of the records did not cause the injury."

Just the opposite is true in the case at bar. The *search* of the applicable records on Mr. Bufford was carried out in perfectly good order; there were no records missing, or stored elsewhere, which could or should have been searched. It was the inaccurate information contained in the correct file—the wrong book on the right shelf, one might say—that led directly to the injury. Also, the "care" and "custody" of the records in question *were* at fault in the instant case, unless one attempts to assert that the updating and revising of open files, as new facts become known and old ones become obsolete, does not come under the heading of "care, custody and control." Any who would contend this should be compelled to explain just who *is* to be responsible for the work of such corrections and updating, if not the agency that has actual custody of the files.

We see no need to dwell at length on the question of whether the damages prayed for by the plaintiff are permissible under the appropriate statute, since that is a question inextricably tied up with the future adjudication of the plaintiff's claim on the merits. We note, however, that the plaintiff's claim for damages on the basis of his wrongful arrest and false imprisonment may very well be held to be covered by the allowance for damages for "pain and suffering" under the statute, especially since the courts have already held that a recovery for the negligent infliction of emotional distress *is* permissible under this particular law. *Francart v. Smith,* 2 D.&C. 4th 585 (1989).

It is our hope that the above opinion will stand for the proposition, with reference to the evil scene with which we opened our discussion of this matter, that those who are damned by a spot may yet be saved by the pen.

Accordingly, we enter the following:

### ORDER

And now, September 4, 1991, we hold that the plaintiff's action in the above-named case is permissible under the exception to sovereign immunity contained in 42 Pa.C.S. §8522(b)(3), and we dismiss the defendant's objections to this action, with prejudice.